(C. D. 529)

ELY & FRYE v. UNITED STATES

United States Customs Court, Second Division

(Decided September 15, 1941)

*E. D. Howald* for the plaintiffs.
*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of Cleveland, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation described in the entry as "A S M Co. (99945) Inventors Model Press." Duty was levied thereon at the rate of 27½ per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as a machine not specially provided for. It is claimed that said article is properly entitled to free entry under the provision in paragraph 1720 of said act for "Models of inventions and of other improvements in the arts, to be used exclusively as models and incapable of any other use."

At the hearing, held at Cleveland on December 16, 1940 before Brown, Judge, the plaintiffs offered in evidence the testimony of two witnesses. The first, Bernard C. Frye of the patent law firm of Ely & Frye, the plaintiffs herein, testified that the so-called inventor's model press constituting the imported merchandise herein was one-eighth the size of the normal tire press used for the vulcanizing of pneumatic tires; that said press was the invention of an Englishman named Macbeth, and was shipped to the witness' firm to be turned over to the Akron Standard Mold Co.; that the latter company was to examine the press and if it was thought that similar presses could be sold in this country, a license would be obtained under the English

and American patent laws for the sale of said presses in the United States; that the imported article was of no use except as a model; and that it has never been used for any other purpose. The witness then proceeded to testify in part as follows:

Judge Brown. You didn't get the American license on the English patent?

The Witness. It is still pending. The U. S. patent is still pending.

Judge Brown. Is this model filed as part of that application?

The Witness. No, it is not necessary to file a patent model any longer.

Judge Brown. It is only to show the American people what it was about, and whether they wanted an American license taken out so that they could sell it in this country?

The Witness. That is right.

Judge Brown. The machine it represented in this country?

The Witness. When it is full size.

\*     \*     \*     \*     \*     \*     \*

By Mr. Howald.

\*     \*     \*     \*     \*     \*     \*

Q. And as far as you know, would it have any commercial use outside of being used as a model?—A. None so far as I know. People can look at it and see what the main press would look like. Outside of advertising value I know of no other use.

The second witness, H. C. Bostwick, developing engineer in the employ of the Akron Standard Mold Co., testified that his company was the ultimate consignee of the press at bar, and that the same had no commercial use as a press. On cross-examination he testified in part as follows:

X Q. Did this press have any power of its own?—A. No, you had to pump it up with a bicycle pump.

X Q. When you pumped it up or down you were able to demonstrate what work would be done by the large size press?—A. Yes, it would show you what it would do.

\*     \*     \*     \*     \*     \*     \*

X Q. Did you ever manufacture any product, or vulcanize any rubber with this model?—A. No, not that model. We have manufactured some Macbeth presses, but entirely different from this.

X Q. You didn't make them from this model?—A. No.

X Q. Did you use this model whatever to manufacture anything?—A. Nothing at all.

The Government offered the testimony of two witnesses. The first, J. M. Steward, examiner of merchandise at the port of Cleveland, testified that he examined the press in question at the time of importation, and that in his opinion it could be used to demonstrate the operation of a full-size press.

On cross-examination he testified in part as follows:

By Mr. Howald.

X Q. In your recollection of this machine, do you remember whether or not it had valves in it?—A. I didn't take it apart to see.

\*     \*     \*     \*     \*     \*     \*

X Q. And your idea that it could be used for a demonstration, just what information is that idea based upon?—A. From the examination of the machine itself.

X Q. That is just from the outside of the machine?—A. By taking hold of the levers at the top I could open these compartments where the tire could be put in, and then close down again.

\*      \*      \*      \*      \*      \*      \*

X Q. Tell me why it is that you think it can be used for a demonstrator, if you didn't know what the insides were?—A. In the first place, it would show you what the large machine would be like, and how it was built.

X Q. It would show the outside?—A. Yes.

X Q. It wouldn't show the inside, would it?—A. Not unless you took it apart.

The second Government witness, E. F. Crotser, deputy collector of customs at Akron, Ohio, since 1935, testified that the entry herein came to his official notice at the time of importation; and that he had made inquiry of the importer in regard to its use.

At this juncture, over objection by counsel for the plaintiff, the witness was permitted to testify as follows in answer to questions as to what use the plaintiffs intended to put the model: "To interest the Akron Standard Mold Company to build that model, or purchase one of those models."

By Mrs. BENNETT.

Q. Only the Akron Mold Company?—A. They stated if the Akron Standard Mold Company would not be interested, that they would interest some other concern to do the same thing.

Counsel for the plaintiffs then moved to strike out the witness' testimony on the ground that it did not contradict the testimony of the first two witnesses. The decision on the motion was reserved by the trial judge for this division, and the motion is hereby denied for the reason that the testimony in question does in some respects modify the testimony of the other witnesses.

Upon this record it is evident that the miniature press in question was used only as a demonstrator to promote the sale of the full-size presses in this country. There is no evidence in the record that it was ever used in the United States as a model from which the manufacturer could make a full-size press.

In the case of *United States* v. *American Brown Boveri Electric Corporation*, 17 C. C. P. A. 329, T. D. 43776, the appellate court reviewed the legislative history of paragraph 1620 of the Tariff Act of 1922, which has the same wording as the present paragraph 1720 under which the plaintiffs claim. Among other things the court in its decision said:

\*  \*  \*. The use of an object as a model imports that it must be used for modeling something. The verb "model," as defined by Webster's New International Dictionary, 1925, is—

2. To plan or form after a pattern; to form in model; to form a model or pattern for; to shape; mold; fashion; frame;  \*  \*  \*.

In other words, it is apparent that what the Congress intended to do was to provide for the free admission into this country of models which were to be used for the making or building of something. We do not believe it was the intention to permit a manufacturer in some foreign country with a subsidiary American corporation to prepare any desired number of *miniature reproductions of goods which it had to sell,* and distribute them through the United States gratuitously and evade the payment of duty under the claim that they were models and used exclusively as such. Great abuses will necessarily follow from any such construction of the law, which seems to be framed in careful and exact language, with the idea of not permitting any such construction. [Italics ours.]

\* \* \* \* \* \* \*

In our opinion the phrase "incapable of any other use" in the statute alludes to a substantial, practical use for some utilitarian purpose, arising from the structure of the article itself, and not some accidental, occasional, or fugitive use.

If articles claimed to be models are capable of performing the functions of the objects or structures which they were designed to represent, this phrase of the statute would apply, for in such case they would not be "incapable of any other use"; or an article might be entered as a model and yet, by reason of its structure, be capable of performing some function entirely outside of the functions which the article itself, when built, would perform. In other words "incapable of any other use" goes to the functions that may be performed by an article which the phrase "incapable of any other use" is designed to cover, while an article that does not perform any other functions growing out of its structure must still be imported to be used exclusively as a model, which would exclude its free admission for advertising purposes, unless such use was incidental or fugitive.

In the case of *Cunard Steamship Co. et al.* v. *United States*, 22 C. C. P. A. 615, T. D. 47605, two ship models in miniature were held not to be entitled to free entry under paragraph 1620 of the Tariff Act of 1922, on the ground that they were imported for the purpose of display or exhibition and not for the purpose of building steamship hulls from such models, citing *United States* v. *American Brown Boveri Electric Corporation, supra.*

On the facts and the law applicable thereto we therefore hold that the so-called inventor's model press involved herein is properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as a machine not specially provided for, as classified by the collector, which classification is affirmed. All claims of the plaintiffs are therefore overruled. Judgment will be rendered accordingly.